# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDREW FRIEDMAN | * | |
| Plaintiff | * | |
| v | * | Civil Action No. PJM-09-3379 |
| RODERICK SOWERS, et al. | * | |
| Defendants | * | |

## MEMORANDUM

Pending are Defendants' Motions to Dismiss or for Summary Judgment. ECF No. 19, 29, and 38. Plaintiff opposes the motions. ECF No. 23, 31, and 40. Also pending are Plaintiff's Motions for Appointment of Counsel (ECF No. 24, 32 and 42); and for Outside Medical Treatment (ECF No. 41). Upon review of the papers filed, the Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow summary judgment shall be denied in part and granted in part and Plaintiff's Motion for Appointment of Counsel shall be granted.[1]

## Background

Plaintiff claims on September 11, 2009, he was assigned to the top bunk of a cell at the Maryland Correctional Institution – Hagerstown (MCIH) despite the fact that he has a serious disorder which causes him to suffer grand mal seizures. He claims he showed Officer Harper and Sg. Coulter a medical alert stating he had a seizure disorder and needed a lower bunk, but he was assigned to a cell with another inmate who also had a medical order for a lower bunk. ECF No. 1 at Ex. 1, p. 13. Plaintiff subsequently made several written requests to correctional staff for a lower bunk, and showed them doctors' orders requiring a lower-bunk, but was told he would get

---

[1] Plaintiff's Motion for Outside Medical Treatment shall be denied inasmuch as this Court finds that the medical care provided to Plaintiff is constitutionally adequate.

a ticket for refusing housing if he did not accept the cell assignment provided. *Id*. Plaintiff also claims he wrote several requests to Coulter and to the Warden requesting a lower bunk and complaining that he was not receiving his seizure medication. In addition he spoke to Officer Ray several times about the dilemma, but Ray simply replied he would need to talk to Coulter about it. *Id.*

On September 18, 2009, Plaintiff claims he had a grand mal seizure at approximately 2:30 a.m. and fell from the top bunk to which he was assigned, injuring his ankle in the fall. He claims that Officers Bourtan, Swayne and Traux reported to his cell after the fall and that despite Bourtan's report that Plaintiff had a seizure, Sgt Gladhill ordered the officers to falsify a report stating Plaintiff had been fighting. *Id*. at p. 15. Plaintiff claims Gladhill stated over the loudspeaker, "I don't care what they say you saw them fighting." *Id*. Plaintiff states he was transported to the medical department via stretcher and the officers were arguing over how to write ticket, as it was clear to them that Plaintiff had not been fighting. Plaintiff claims Swayne began taking pictures of Plaintiff's face, but not of his injured ankle. When Plaintiff asked Traux why he would be getting a ticket, Plaintiff claims Traux said it was based on Gladhill's orders. Upon arrival to medical Plaintiff was seen by Linda Eves who stated she could not believe Plaintiff had not received his seizure medication for 17 days. She then ordered an ice pack and pain medication for Plaintiff's injured ankle.[2]

Plaintiff also claims that Correctional Medical Services (CMS) is not properly treating his chronic illnesses. He states he has requested blood work for hepatitis C, HIV testing, and to

---

[2] Plaintiff claimed Coulter put him in a cell with an inmate, Robert Smith, with whom he had problems. The placement culminated in Plaintiff being assaulted by Smith. ECF No. 1 at Ex. 1., p. 18. Defendants stated there was no evidence to support an allegation that Plaintiff had ever been assaulted by Smith. Plaintiff subsequently abandoned this claim in his Response in Opposition. ECF No. 23.

determine his Depakote levels[3] since June 2009.  He claims that although Dr. Alan Rohar knew Plaintiff was taking 1000 mg of Depakote two times per day, he prescribed 500 mg two times a day and did so without benefit of having bloodwork done to check Plaintiff's Depakote levels. Plaintiff further explains that it is documented he has suffered a seizure disorder since he was twelve years old and that he has received Depakote since he arrived in the custody of the Division of Correction (DOC).  Plaintiff claims as a result of not being provided the proper dosage of Depakote he suffered several seizures causing injuries to his back and ankle and cracking a tooth.[4]  ECF No. 1 at Ex. 1, pp. 21 – 24 and ECF No. 21.  Plaintiff also claims the pain he suffers after having a seizure is not treated by medical staff.

Defendants Correctional Medical Services, Black, Dilemia, King and Vest ("medical Defendants") admit Plaintiff has epilepsy for which he was prescribed Depakote, later changed to Valproic acid.[5]  They state that on June 12, 2009, when Plaintiff arrived in the custody of the Division of Correction, his valproic acid level was very low, a condition caused when patients neglect to take anti-epileptic medication.  ECF No. 38 at Ex. A and Ex. C, pp. 4 – 5.  Plaintiff was prescribed Depakote, 500 mg twice per day.

Plaintiff reported to the Dispensary at Maryland Reception Diagnostic and Classification Center (MRDCC) on July 31, 2009, stating he had a seizure three hours previous to his visit, but he had no signs of injury.  Plaintiff stated he had a headache and was provided Tylenol. *Id.* at Ex. C, p. 11.  Plaintiff was transferred to Maryland Correctional Training Center (MCTC) in the beginning of August 2009.  Shortly after his arrival at MCTC, on August 21, 2009, he claimed

---

[3] Blood tests are used to insure that a therapeutic range of valproic acid is maintained so that the risk of side effects may be minimized.  *See* http://www.labtestsonline.org/understanding/analytes/valproic_acid/test.html.

[4] Plaintiff claims that on August 21, 2009, he suffered a seizure and cracked a tooth on which he had recently spent $3000 for a root canal.  The tooth had to be pulled on August 25, 2009.

[5] Valproic acid is the generic equivalent to Depakote.

3

he cracked one of his teeth during a seizure. The seizure was not witnessed by any staff. The cracked tooth was extracted without complications. *Id.* at Ex. C, pp. 12, 16—17, and 20. By August 28, 2009, Plaintiff's valproic acid level was close to therapeutic range. His prescription for Depakote was continued at that time.

On September 11, 2009, Plaintiff was transferred to the infirmary located at Maryland Correctional Institution – Hagerstown (MCIH). Plaintiff reported that he was having one grand mal seizure per day and that he had not received any Depakote since September 7, 2009. No members of the medical staff witnessed any of the reported seizures, however, Plaintiff's Depakote prescription was increased from 500mg twice per day to 1000mg twice per day. *Id.* at pp. 22—25. On September 18, 2009, Plaintiff claimed he fell out of the top bunk in his cell during a seizure. His ankle was injured during the fall and he was provided with a pair of crutches as well as an x-ray. The x-ray revealed that the ankle was no fractured or dislocated. Plaintiff was provided with muscle rub and Motrin for the pain. On September 29, 2009, when Plaintiff requested a refill of the muscle rub and Motrin, he reported that he had not received his Depakote for a number of days. Medical Defendants admit Plaintiff did not receive his medication from September 19 through September 27, 2009. After receiving the evening dose on September 28, 2009, he continued to receive his medication as prescribed until October 2, 2009.[6] On that date Plaintiff was transferred to Roxbury Correctional Institution (RCI).

From October 3 through October 11, 2009, Plaintiff did not come to "pill call" to receive his Depakote with the exception of October 6 and 8, 2009 when he received his morning doses. *Id.* at Ex. C, pp. 36—37. On October 11, 2009, Plaintiff was brought to the dispensary when he reported having a seizure. He was evaluated and no injuries were noted. On October 12,

---

[6] On October 1, 2009, Plaintiff was permanently assigned to a bottom bunk due to his epilepsy. ECF No. 38 at Ex. C, pp. 26 – 34.

4

2009, Plaintiff did not receive his medication and Defendants offer no explanation why.  plaintiff received his medication regularly from October 13, 2009 through October 22, 2009, and on that date was given 37 tablets of Depakote to "keep on person" so he could keep the medication in his cell and take it on his own.  *Id*. at Ex. C, pp. 50 – 51.  Plaintiff again complained on October 29 and 31, 2009, that he had not received his Depakote.  He was provided with 60 tablets routinely until March 4, 2010, when the prescription was not approved.  *Id*.  pp. 51, 54—56, and 145—49.

On March 19, 2010, Plaintiff's epilepsy medication was changed from Depakote to VPA or Depakene.  He was given a 15 day supply which should have lasted until approximately April 3, 2010.  Plaintiff was told he should request a refill no later than March 30, 2010.  *Id*. at Ex. A, p. 6.  Plaintiff did not request a refill until April 4, 2010.  He suffered a seizure on April 7, 2010, which was witnessed and reported by a correctional officer.  When Plaintiff recovered from the seizure he informed the nurse he had not taken his medication for four days.  At that time Plaintiff's refill was confirmed and he was given the medication.  *Id*. at Ex. C, pp. 101-103 and 150.

With respect to the blood tests requested by Plaintiff, Defendants state that a Depakote level was performed in August 2009 and when Plaintiff was called to have the other requested tests done on October 27, 2009, he refused to go to the Dispensary.  *Id*. at pp. 48 – 49; 52—53.  The blood tests were reordered on November 17, 2009.  Dr. Menon states that Plaintiff told him on November 17, 2009, that he had not suffered a seizure since the end of September.  He further alleges that Plaintiff later claimed he had not been seen in the chronic care clinic for five months even though he had been seen approximately one week beforehand.  *Id*. at Ex. A, p. 5. ; Ex. C, pp. 68 – 72.   The results of the requested blood tests were reported almost a year later on

October 6, 2010. At that time Plaintiff was HIV negative, but tested positive for Hepatitis C. Plaintiff is not eligible for antiviral therapy for the Hepatitis C because his "viral load" is too low. *Id*. at Ex. A, p. 7; Ex. C, pp. 158 – 61.

With respect to Plaintiff's back and ankle pain, medical Defendants state he has been prescribed Motrin, Naprosyn, Baclofen (a muscle relaxant), and muscle rub cream. Plaintiff complains these medications do not address his pain and frequently seeks stronger medication such as Ultram, a narcotic analgesic. Defendants state, however, that due to the chronic nature of Plaintiff's pain, a narcotic analgesic is medically contraindicated. *Id*. at Ex. A, p. 8. In addition to the pain medication provided, Plaintiff's back was x-rayed[7] and he was provided with a back brace on August 25, 2009. *Id*. at Ex. C, pp. 18—19. With respect to his ankle, Plaintiff was provided with crutches on September 18, 2009. An x-ray taken on September 21, 2009, which showed no injury. Plaintiff returned the crutches on November 11, 2009, and despite complaining to a nurse on December 26, 2009, that he never received an ankle brace, Plaintiff refused to pick up the brace when it arrived on February 15, 2010. *Id*. at Ex. C, pp. 75 – 81 and 87 – 92. On March 2, 2010, Plaintiff continued to complain that his ankle hurt. He was provided with the ankle brace on March 15, 2010. *Id*.

With respect to Plaintiff's assignment to a bottom bunk, Defendants Ray and Coulter claim that Plaintiff never showed them the medical order requiring a lower bunk assignment. ECF No. 19 at Ex. 3 and 4. They concede, however, that a medical order dated June 27, 2009, required Plaintiff to be assigned to a lower bunk and that he was not assigned to a lower bunk until September 23, 2009, after he had fallen from the upper bunk during a seizure. *Id*. at Ex. 2, p. 1 and Ex. 4.

---

[7] The x-ray revealed moderate degenerative joint disease, degenerative disc disease, and possible herniated discs.

## Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(c) which provides that:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### Respondeat Superior

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir.2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.2001) *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984). Supervisory liability under section 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994). Plaintiff has pointed to no action or inaction on the part of Defendant Galley that resulted in a constitutional injury. Accordingly, Galley's Motion for Summary Judgment (ECF No. 29) shall be granted.

### Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173

(1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in

9

light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Plaintiff asserts the medical restriction for a lower bunk was presented to Coulter and Ray as it was printed on his inmate identification card. ECF No. 23. The undisputed facts establish that Plaintiff had a medical order for a lower bunk dated June 27, 2009, but he was nonetheless assigned to an upper bunk from which he fell during a seizure. Whether the failure to provide Plaintiff with a lower bunk to accommodate his physical disability was done with the knowledge that there was a valid medical order in existence is the subject of a genuine dispute of material fact. Plaintiff's assertion is that Coulter and Ray knew there was a medical requirement; Coulter and Ray state they were unaware. Thus, summary judgment is inappropriate as to the claims against Coulter and Ray.

With respect to the claims against Sowers, Gladhill, Traux, Bennet, Harper, and Galley, the Motion to Dismiss or for Summary Judgment does not directly address the allegations against them, nor is there a clear statement as to why these Defendants are entitled to summary judgment. Accordingly, the motion shall be denied with respect to these Defendants.

Also undisputed is that Plaintiff's medication has been disrupted on a number of occasions. Plaintiff provides documentation indicating that he went thirty days without his medication, filed an administrative remedy procedure complaint (ARP) about the matter, and the complaint was found meritorious. ECF No. 31 at pp. 7 – 8. Medical Defendants do not supply a reason for the interruptions in Plaintiff's medication other than the fact that his prescription ran out and, on one occasion, Plaintiff was late submitting his request for a refill. At most the failure to deliver Plaintiff's medication in a continuous manner was due to the incompetence of medical

10

staff. There is no evidence that Plaintiff was deliberately denied medication for his epilepsy; rather, whenever it was brought to medical staff's attention that Plaintiff had not received his medication, measures were taken to insure the problem was corrected.[8] "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge). The medical Defendants[9] are entitled to summary judgment in their favor and correctional Defendants are entitled to summary judgment on the claim regarding medication delivery to the extent the claim was raised against them.

      A separate Order follows.

December 22, 2010

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

---

[8] The Court notes that the claim that medication is interrupted due to lapses in refills or other mishaps is a common complaint raised by Maryland Division of Correction inmates. To the extent that there is a systemic problem causing the issue, the failure to address the problem may at some point become constitutionally actionable.

[9] Medical Defendants include Cindy Black, CMS, Francis Dilemia, Stacy King, and Louise Vest.