IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | | |
|---|---|---|
| ANDREW B. FRIEDMAN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No 8:09-cv-03379-PJM |
| WARDEN RODERICK SOWERS, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \*

## JOINT PRETRIAL ORDER

Plaintiff Andrew B. Friedman and Defendants Roderick Sowers, Jeffrey Coulter, Paul Ray, Ryan Harper and Scott Gladhill, by their respective undersigned counsel, pursuant to the Court's Order and Loc. Rule 106 submit this proposed Joint Pretrial Order.

### I. Plaintiff's Statement of Facts

Andrew Friedman suffers from epilepsy, a seizure disorder that he has had since he was thirteen years old. Despite taking medication for his epilepsy, Mr. Friedman continues to suffer from gran mal (tonic-clonic) seizures. Mr. Friedman's epilepsy was documented in his prison health record in 2009 before he was transferred to MCI-H. It also is documented on the back of his Division of Correction identification card.

Because it is not possible to know when he will suffer a seizure, and because they sometimes occur while he is sleeping, Mr. Friedman must sleep on a lower bunk. On August 18, 2009, the Maryland Division of Correction issued Mr. Friedman an identification card that he retained with him when he was moved to the Maryland Correctional Institution-Hagerstown in

September 2009. That identification card states clearly on its back the following: SEIZURE DISORDER, LOWER BUNK.

Mr. Friedman was moved to MCI-H from the Maryland Correctional Training Center ("MCTC") on September 11, 2009. When he arrived at MCI-H, he was taken to the property room, where he went through his property and spoke to an officer. Mr. Friedman looked at the "traffic" sheet (a sheet indicating where he would be housed) that had the letter "B" next to his name, indicating that he was assigned to a top bunk. Mr. Friedman showed the officer his DOC identification and said that he could not be on the top bunk. The officer informed Mr. Friedman that he should tell the officers who would escort him to his cell in the Antietam Housing Unit ("AHU"). As soon as Mr. Friedman met officers Defendants Harper and Coulter, he showed them his identification card and explained that he needed a lower bunk. Those defendants then walked Mr. Friedman to cell C12 in which Richard Funari, who had a lower-bunk slip because he also suffered from seizures, was housed already. Mr. Friedman protested that he could not stay in that cell because both he and Funari needed a lower bunk, but Coulter and Harper told Mr. Friedman that he would receive a "refusing housing ticket" if he did not stay in the cell. He assented and entered the cell, and promptly sat down to write a letter to the Commissioner of Corrections requesting a lower bunk. He also wrote a letter to Warden Sowers requesting a bottom bunk.

Mr. Friedman first encountered Defendant Ray on the next day, September 12. Mr. Friedman showed Ray his identification at that time and told him that he and his cellmate both had seizures and that both needed a lower bunk. From then until he was eventually transferred, Mr. Friedman requested to be moved to a cell with a bottom bunk every single day.

2

Every day when he asked Defendant Ray for a cell with a bottom bunk, however, the Officer would respond that he had to talk to Defendant Coulter about it.

Mr. Friedman saw then-Sergeant Coulter less frequently but whenever he did see him, Mr. Friedman would ask when he was getting a bottom bunk. Coulter replied with variations of statements like "You're fine, you'll be alright," and then ignored Mr. Friedman's request. On one occasion Mr. Friedman was being escorted to the medical department by Officer Chad Jones when Sergeant Coulter was standing in the hallway. Mr. Friedman asked Officer Jones loudly what it said on the back of his ID and Officer Jones said "Seizure disorder, lower bunk." Mr. Friedman then said, "why don't you tell Sergeant Coulter what that means? I don't think he understands what that means." Jones and Mr. Friedman continued walking and Jones said that the Sergeant didn't do his job.

In addition to his repeated requests to Defendants Ray and Coulter, Mr. Friedman asked Defendant Gladhill to arrange a bottom bunk and wrote a letter and several ARPs to Warden Sowers. After he had completed writing an ARP, Mr. Friedman would need an officer to review it and sign it so that it could be sent in. He testified that in the evenings when he had finished writing an ARP, Sergeant Gladhill would read the ARP – reading about Mr. Friedman's need for a bottom bunk – and then sign it. Mr. Friedman also orally told Gladhill that he needed a lower bunk. Sergeant Gladhill simply told Mr. Friedman that it was "up to the day shift [to move him]."

On the night of September 18, 2009, while sleeping in his bunk, Mr. Friedman suffered a gran mal seizure and, as a result, fell out of his bed. He remembers waking up on the floor of his cell and seeing blood "all over the place." His cellmate had been sitting, writing a letter on the right-hand side of the bunk. He sat at a little table in between the two lockers. When

Mr. Friedman fell during his seizure, he first landed on his cellmate and continued falling to the floor.

As a result of this seizure, Mr. Friedman suffered physical injuries, including injuring his ankle. To this day, he is unable to put his full pressure on his ankle, and it continues to be swollen. Falling from the bed also reinjured his lower back, which had been previously injured in the mid-1990s in a motorcycle accident. After the fall, several officers took Mr. Friedman to the medical unit.

After he was injured from his fall, Mr. Friedman was on crutches – and yet still was not given a lower bunk. He continued to ask Officer Ray for a lower bunk. After Mr. Friedman continued to ask for a lower bunk, Officer Ray eventually moved him to a new cell. Officers Coulter and Ray moved Mr. Friedman from his cell with Richard Funari to a cell with Robert Smith. Unfortunately, Robert Smith had been using the bottom bunk and was not happy that Mr. Friedman was given it. When Mr. Friedman was returning from the shower one day, still on crutches, he informed Sergeant Coulter and Officer Ray that he could not go back to his cell because Mr. Smith was unhappy at being on the top bunk and was planning to fight him. Sergeant Coulter told him he would get a "refusing housing" ticket if he did not go back to his cell. Five or ten minutes later, after returning to his cell, Mr. Friedman had a black eye, and had to be escorted to the medical unit.

A prison official can violate the Eighth Amendment in two ways. *See McIntyre v. Robinson*, 126 F. Supp. 2d 394, 400 (D. Md. 2000). An official can be deliberately indifferent to the prisoner's existing serious medical needs, *see Estelle v. Gamble,* 429 U.S. 97 (1976), or he can be deliberately indifferent to conditions posing a substantial risk of serious future harm. *See Helling v. McKinney,* 509 U.S. 25 (1993). In this litigation, Mr. Friedman proceeds under

4

both theories. Plaintiff believes that legal issues regarding qualified immunity have been decided.

## II. Defendants' Statement of Facts

The transfer procedure to send a Maryland inmate to a Maryland prison is governed by Division of Correction Directive 230-4. The sending institution prepares a transfer list with the housing identifier assigned and any other pertinent alert information. Upon transfer, the receiving institution considers any transfer alerts, including medical alerts. Further, the contracted medical provider is charged with assuring the continuity of inmate medical care in the transfer process. The medical contractor is a private corporation. A clinician at both the sending and receiving facility is required to review the inmate's medical record and enter data about his medical screening. According to procedure, within 4 hours of transfer to the receiving institution, a medical professional shall review the inmate's medical record, unless he has an "S-Medical" code and then the chart shall be reviewed within an hour of the inmate's arrival at the receiving institution.

The transfer of inmates is coordinated with the Maryland Division of Correction headquarters, the sending institution and the receiving institution. The institutional traffic officer is responsible for making the initial housing and cell assignment for the in-coming inmate. The traffic officer will check OBSCIS, the computer program used by Maryland prisons, to ensure that the cell assignment does not conflict with an enemy or medical alert. After the initial assignment, it was the practice of MCI-H for the housing unit manager lieutenant or sergeant to re-assign inmate housing on the day shift, if necessary. Absent emergency or extraordinary reasons, in 2009 it was the practice at MCI-H to move an inmate from one cell to another during the day shift.

Melissa Jordan was the traffic officer when Mr. Friedman arrived at MCI-H on September 11, 2009. The day prior to the transfer she received an e-mail from Division of Correction headquarters regarding the transfer. That e-mail presented no information about Mr. Friedman's medical alert request. Plaintiff's OBSCIS alert did not contain a medical alert for a bottom bunk.

As the warden of MCI-H, Warden Sowers was responsible for management of the correctional facility; he supervised over 600 people and in 2009 there was a daily average inmate population of 2,035. With regard to Mr. Friedman, the first time that Mr. Sowers learned about a problem with a bottom bunk was through the Administrative Remedy Process (ARP) process, after Mr. Friedman's September 18 fall.

Sgt. Coulter was the Officer in Charge (OIC) of the Antietam Housing Unit (AHU), which contains a segregation and general population inmates. As OIC, he supervised the AHU, where there are 4 wings, with 96 inmates housed in each wing. Sgt. Coulter does not recall talking to Mr. Friedman or being told that he needed a bottom bunk. He found out on September 23, 2008 that Mr. Friedman wanted a bottom bunk.

Sgt. Gladhill does not recall that Mr. Friedman said that he had needed a bottom bunk; rather, he recalls that Plaintiff had issues with ARPs. He remembers Officer Rhoton calling about his seizure and that Officers Swain and Truax took him on a stretcher to the medical department. When Plaintiff returned from the medical department he was not given a bottom bunk because there was no medical order to do so.

Correctional Officer Ray testified that if an inmate needed to be moved from his cell Officer Ray must contact the housing officer for permission to make the move and it would be the decision of the housing officer about whether the change was made or he will not move an

inmate without checking with the sergeant. When Correctional Officer Ray returned from his days off around September 18-21, he recalls seeing Mr. Friedman with crutches. He called his sergeant and had him moved to cell 4, bottom bunk with an inmate named Smith, an old man.

Correctional Officer Harper had no conversations with Mr. Friedman because he worked on the "B" wing and Plaintiff was assigned to "C" wing. He was not involved in escorting Mr. Friedman when he first came to MCI-H because he was not an escort officer.

While at MCI-H Mr. Friedman filed several complaints pursuant to the Administrative Remedy Procedure (ARP), a means of addressing inmate problems. Mr. Friedman first filed an ARP about requiring a lower bunk at MCI-H dated September 20, 2009, after his fall.

A review of Mr. Friedman's medical records for the period of September 11, 2009 to October 2, 2009 while he was housed at MCI-H reveals that there was a medical order dated October 1, 2009 for a lower bunk and no record about a black eye.

Defendants did not act with deliberate indifference to a serious medical need; they also did not deny, delay or interfere with medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). Deliberate indifference occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), *Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). The Defendants were not aware of the facts which showed an excessive risk of harm and they did not draw an inference that there was a substantial risk of harm. An inmate cannot create liability merely by complaining to anyone who is an employee in the prison about the failure to address a medical complaint. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

Further, negligence, or medical malpractice do not amount to a violation of the federal constitution. *Estelle v. Gamble*, 429 U.S. at 106.

Plaintiff maintains that he suffered from prison conditions that posed a serious risk to his health, relying upon conditions of confinement cases such as *Helling v. McKinney*, 509 U.S. 25 (1993) and *McIntyre v. Robinson*, 126 F.Supp. 2.d 394 (D. Md. 2000). However, to succeed on this premise, "the deprivation alleged must be sufficiently serious." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (internal quotation marks and citation omitted). "To demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions." *Brown v. North Carolina Department of Corrections*, 612 F.3d 720, 723 (4th Cir. 2010). Plaintiff's resulting injuries were relatively minor and do not amount to a serious or significant physical injury.

Warden Sowers will also rely upon the law that there is no supervisory liability in § 1983 actions. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994)(citations omitted). *See also*, *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985).

The defendants will also request judgment on the basis of qualified immunity because the law was not clearly established at the time the action was taken. *Harlow v. Fitzgerald*, 457 U.S.800, 818 (1982). Pre-existing law for purposes of determining qualified immunity is law that "has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state," *Wilson v. Layne*, 141 F.3d 111, 114 (1998) (en banc)(quotations and citation omitted), aff'd, *Wilson v. Layne*, 526 U.S. 603 (1999). Neither the Supreme Court, the Fourth Circuit or the Maryland Court of Appeals had clearly established that correctional officers are obliged to second guess medical contractors.

**III.   Amendments to the Pleadings**

None.

**IV.   Abandoned Issues**

None.

**V.   Stipulations or Requested Stipulations**

None.

**VI.   Damages or other Relief**

Plaintiff seeks compensatory damages and will seek an award of reasonable attorneys' fees and expenses.

**VII.   Documents and Other Exhibits**

   A.   Plaintiff's

Plaintiff's proposed Exhibit List is attached.

   B.   Defendant's

   1.   Division of Correction Directive 230-4.
   2.   Medical Evaluation Manual, Chapter 7, Inmate transfer screening.
   3.   E-mail from DOC headquarters about transfers
   4.   OBSCIS alert
   5.   MCI-H ARP 2009 log book for Mr. Friedman
   6.   Offender Traffic History
   7.   Mr. Friedman's medical records
   8.   MCI-H ARP 1339-09
   9.   MCI-H ARP 1309-09
   10.   Log book September 18, 2009

VIII. **Fact Witnesses**

    A.    Plaintiff's

        Andrew Friedman
        Jessup Correctional Institution
        7803 House of Correction Road
        Jessup, Maryland  20794

        Richard Funari
        Jessup Correctional Institution
        7803 House of Correction Road
        Jessup, Maryland  20794

        Steven Johnson
        Jessup Correctional Institution
        7803 House of Correction Road
        Jessup, Maryland  20794

        Melissa Jordan
        ℅ Stephanie Lane-Weber
        Correctional Litigation Division
        Office of the Attorney General
        200 St. Paul Place
        Baltimore, Maryland 21202

    B.    Defendants'

        Roderick Sowers
        18595 Roxbury Road
        Hagerstown, Md. 21746
        (240) 420-1280

        Jeffrey Coulter
        Maryland Correctional Institution - Hagerstown
        18601 Roxbury Road
        Hagerstown, Maryland 21746
        (240) 420-1000

        Paul Ray
        Maryland Correctional Institution - Hagerstown
        18601 Roxbury Road
        Hagerstown, Maryland 21746
        (240) 420-1000

>Ryan Harper
>Maryland Correctional Institution - Hagerstown
>18601 Roxbury Road
>Hagerstown, Maryland 21746
>(240) 420-1000
>
>Scott Gladhill
>Maryland Correctional Institution - Hagerstown
>18601 Roxbury Road
>Hagerstown, Maryland 21746
>(240) 420-1000
>
>Melissa Jordan
>Maryland Correctional Institution - Hagerstown
>18601 Roxbury Road
>Hagerstown, Maryland 21746
>(240) 420-1000

**IX.    Experts**

  A. Plaintiff's

>Robert L. Cohen
>314 West 14th Street
>New York, New York 10014

Dr. Cohen is a medical doctor who specializes in health care delivery in prisons. It is anticipated that Dr. Cohen will testify that because epilepsy in inmates is a serious medical condition that poses substantial risks of injury to inmates if they have a seizure while on a top bunk that Mr. Friedman should have been placed in a bottom bunk, as his identification card stated. It is anticipated that Dr. Cohen will testify that it was reckless or deliberately indifferent conduct by the correctional officers not to follow the instructions on Mr. Friedman's prison-issued identification card to place him in a top bunk and not to respond to Mr. Friedman's repeated requests for a bottom bunk. Finally, it is anticipated that Dr. Cohen will testify that Mr. Friedman suffered significant harm in his fall.

B.   Defendants'

None.

**X.   Deposition Testimony**

A.   Plaintiff's

<u>Jeffrey Coulter</u>                                   <u>Paul Ray</u>

Pg/L   Pg/L

4/8    4/9                                                4/16   4/21
5/8    5/12                                               12/5   12/10
8/4    8/10                                               28/10  28/19
20/8   20/18                                              32/1   32/11
42/13  44/12                                              41/3   41/7
45/16  46:610                                             44/4   44/7
                                                          50/20  51/2

<u>Scott Gladhill</u>                                  <u>Ryan Harper</u>

4/16   4/17                                               4/6    4/9
12/1   12/3                                               7/12   7/13
21/10  23/14                                              8/1    8/6
24/21  26/8                                               10/4   11/11
26/12  27/8                                               11/19  11/212
43/10  43/16                                              20/12  21/1

<u>Roderick Sowers</u>

4/3    4/9
10/21  11/5
37/14  37/21
37/14  39/12

B.   Defendants'

None.

> XI. **Any other pretrial relief, including a reference to pending motions, which is requested.**

The Defendants' will object to the testimony of Plaintiff's expert, Robert L. Cohen, MD., because none of that expert opinion as presented in Plaintiff's portion of this Pre-Trial Order was provided in Dr. Cohen's expert report that was signed on September 11, 2011 and produced in discovery. This new opinion falls outside the discovery deadline and comes as a surprise to the Defendants. In addition, much of the opinion is couched in language that involves the ultimate questions of fact that the jury must decide and, therefore, should not be permitted.

> XII. **Any other matters added by the Court**

None.

Plaintiff reserves the right to present the testimony by deposition of any witness who is unavailable at trial.

                                          Respectfully submitted,

                                            /s/
                                          Joseph B. Espo, Fed. Bar No. 07490
                                          Brooke E. Lierman, Fed. Bar No. 17879
                                          BROWN, GOLDSTEIN & LEVY, LLP
                                          120 E. Baltimore Street, Suite1700
                                          Baltimore, Maryland  21202
                                          T:  410-962-1030
                                          F:  410-385-0869
                                          jbe@browngold.com
                                          bel@browngold.com

                                          *Attorneys for Plaintiff*

                          /s/
               Stephanie Lane-Weber, Fed. Bar No. 00023
               Assistant Attorney General
               Office of the Attorney General
               200 St. Paul Street
               Baltimore, Maryland  21202
               T: 410 576-6340
               F: 410 576-6880
               slaneweber@oag.state.md.us

               *Attorneys for Defendants*

Dated:  March 19, 2013


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this   19th   day of March, 2013 a copy of the foregoing Joint Pretrial Order was served by the court's e-filing system on:

Stephanie Lane-Weber
Correctional Litigation Division
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202

*Attorneys for Defendants*


                          /s/
               Joseph B. Espo